MARTIN VANDEWEG, JR., APPELLEE, V. GUS A. OLSON, DE-
FENDANT: FIRST STATE BANK OF HICKMAN, APPELLANT.

FILED MAY 16, 1921.   No. 21382.

Appeal: CONFLICTING EVIDENCE. When the evidence conflicts respect-
ing the existence of material facts, and such evidence is fairly
submitted to the jury under proper instructions, the verdict will
not be set aside.

APPEAL from the district court for Lancaster county:
WILLARD E. STEWART, JUDGE. *Affirmed.*

*Hainer, Craft & Lane,* for appellant.

*L. T. Fleetwood* and *Sterling F. Mutz, contra.*

DEAN, J.

This action was brought to recover the value of a quan-
tity of sheep and hogs, alleged by plaintiff to be due him,
from defendants Gus A. Olson and the First State Bank
of Hickman. Defendant Olson having absconded, his de-
fault was entered. When plaintiff rested, defendant
moved for an instructed verdict. The motion was over-
ruled. When the taking of testimony was concluded, de-
fendant renewed its motion, which was again overruled.
Upon submission of the evidence the jury returned a ver-
dict against defendants for $511.14. The defendant bank
alone appealed.

Olson bought live stock at Hickman, for shipment to
Omaha and other markets. On September 17, 1918, he
gave two checks to plaintiff, drawn on the defendant bank,
for the sheep and hogs that were bought from him. Plain-
tiff cashed the checks at a bank in a neighboring town.
Payment was subsequently refused by the Hickman bank
and plaintiff was compelled to reimburse the bank where
the checks were cashed.

Plaintiff in substance charges liability of the bank on
the alleged ground that Gus A. Olson, while buying stock
at Hickman, "was acting for and on behalf of the First

State Bank of Hickman;" that the bank was the real party in interest; that the stock was shipped in its name, and that it received the consideration therefor; and, finally, that defendant's association in the business was such that plaintiff was unable to allege "its exact nature."

It seems that Mr. Olson came from Campbell and located at Hickman. On this point Mr. Heckman, cashier of the bank, testified: "Q. You suggested to him that they needed a stock buyer there at Hickman, did you? A. It was suggested to him; that is the reason he came to Hickman. Q. He came to Hickman to talk it over with you. Did you meet him in Hickman or Campbell? A. In Hickman. * * * Q. Was he a man of property, I mean, in this county? A. No, sir. Q. Or any other property so far as you know? A. Not that I am certain of."

The facts upon which plaintiff relies, as tending to prove that there was some agreement between the defendants for handling stock together, or that the bank was an undisclosed principal in the enterprise, are substantially these: From May 8 to September 18, 1918, Olson shipped 22 carloads of live stock from Hickman. Two of the cars in May, 1918, were shipped in the name of May & Olson and 20 cars were subsequently shipped in the name of the bank, plaintiff's stock being consigned in the shipment of September 18. It appears that Olson was practically insolvent; that he wrote checks for stock purchased, when he had no money on deposit, that were paid by the bank, and apparently without any arrangement for liquidation; that Olson's checks given for stock aggregated at times from $2,000 to $3,000, and at one time they aggregated $3,959.89, when he had no money on deposit. It was admitted that, at such times, it was the bank's money that was being used to pay for the stock that Olson bought. It was also shown that no interest was charged against Olson by the bank for the money so used in the purchase of stock.

Plaintiff testified that he talked with Heckman after the checks were dishonored, and that in the conversation

Heckman volunteered the information that there was a "sheep check" and a "hog check," although there was nothing on the checks to indicate what they were given for; that he asked Heckman how he knew what the checks were given for, and that Heckman told him that he talked with Olson before he went away; that the last thing Olson said to him before he left was this: "You tell the boys not to worry about them checks," he says, "they will get every dollar of it back;" that Heckman in the presence of his father and brother admitted that he knew the stock in question was shipped in the name of the bank. The plaintiff's evidence on this point was subsequently corroborated by his father and his brother.

Mr. Heckman denied knowledge that the shipment of the car, in which plaintiff's stock was shipped with other stock, and for which the checks in question were given, was in the bank's name, but subsequently he made this statement. He testified: "Q. How many cars did you know had been shipped in the name of the First State Bank? A. I knew that there had been cars shipped sometime, possibly six months before that." It was shown that, after Olson left Hickman, the cashier and Olson went to Omaha and there met a brother of Olson. Respecting the object of the Omaha trip the cashier testified: "The purpose was to get security on this $1,500. Well, his brother absolutely refused at first. *  *  * He finally signed the note with G. A. Olson for $750. *  *  * At the same time I got a bill of sale from G. A. Olson for the yards there, a couple of hogs and crib. *  *  * Yes, and a $50 Liberty bond, a hog trough and gates and pump." Plaintiff contends that the $750 transaction between the bank and the Olsons is evidence of a division of liability arising from the stock-dealing venture. The cashier testified that the bank held notes of Olson at different times, namely, one for $1,500, and one or two for from $500 to $800.

Mr. Heckman further testified that he made no effort to bring the attention of the county attorney to the fact

that Olson was writing checks on the bank when he had no funds there, because, as he said, "it never entered my mind." From Heckman's evidence it appears that it was not the custom of the bank to honor checks generally for its customers in sums aggregating $3,000 or $4,000 unless they had money in the bank to draw against.

Defendant's explanation of the reason why Olson made the shipments in the name of the bank is that in some former shipments he had failed to pay certain charges that were due the railroad company therefor, and that they were a personal charge against him that would be deducted from the proceeds of subsequent shipments unless they were paid, and that it was to avoid making such payments that he adopted the plan of shipping in the name of the bank. Defendant argues that, in view of the fact that the railroad company did not attempt to collect the delinquent charges from the bank, this "is in itself proof that the railroad at least had no knowledge or suspicion that the bank was in any way interested in Olson's business." In the argument of plaintiff it was suggested that the jury doubtless took note of the fact that the railroad company was not a party to this suit.

From a review of the record, we conclude that, notwithstanding the conflict in the evidence, there is sufficient to support the verdict. We therefore decline to set it aside unless, indeed, it has come to pass that, with respect to controverted questions of fact, the jury has ceased to function in Nebraska.

The judgment is

AFFIRMED.

ROSE and FLANSBURG, JJ., not sitting.